Ronald **TURNER**, Petitioner,

v.

**STATE of Tennessee**, Respondent.

Supreme Court of Tennessee.

Aug. 16, 1976.

Thomas H. McCallie, III, John C. Littleton, Chattanooga, for petitioner.

R. A. Ashley, Jr., Atty. Gen., Michael E. Terry, Asst. Atty. Gen., Nashville, for respondent.

## OPINION

FONES, Justice.

We granted the writ of certiorari in this case and a case styled *Bush and Bolton v. State of Tennessee*, 541 S.W.2d 391 to clarify the presumption or inference that may be drawn from proof of possession of recently stolen property. Our opinions in the two (2) cases are being released simultaneously.

Turner was convicted of concealing stolen property, sentenced to three (3) to five (5) years in the penitentiary and the Court of Criminal Appeals affirmed.

### I.

About midnight on Friday, September 6, 1974, James R. Welch went into the J & B Club located on the Clinton Highway in Knox County, Tennessee to have a beer. As he expressed it, he made the mistake of leaving the keys in his 1967 Oldsmobile and after a sojourn of approximately twenty (20) minutes in the club, he discovered his car had been stolen and notified the police.

About 7:00 p. m. on Saturday, September 7, 1974, a homeowner in Chattanooga called the police to investigate vehicle damage to his garage and its contents. Officer Lyda's investigation disclosed that a 1967 Oldsmobile parked on a slope had rolled backward into the garage of a house across the street, damaging bicycles and a vehicle. Upon inquiry at the scene for the owner of the Oldsmobile, Lyda testified that defendant came forward and said the car belonged to a friend of his and that he had borrowed it. Defendant had no registration papers, and Lyda checked with the National Crime Information Center and received the report that the Olds had been stolen. Defendant was placed under arrest and transported to the Chattanooga Police Station. He was advised of his constitutional rights and informed that he would be charged with grand larceny of an automobile and receiving and concealing stolen property. Officer Lyda left him alone in an interrogation room for about twenty (20) minutes, and he tried to escape by removing a ceiling tile and making his way into the space above the false ceiling.

At the trial his mother testified that on Friday morning about 11:00 a. m., September 6, 1974, defendant left her home to catch the bus to go to school. About 3:00 p. m. on Saturday, September 7, 1974, he returned in a station wagon and told her that Eddie gave him the keys to the car at the VIP Club in Knoxville. He told her he had come home to get some money. She said

that two (2) checks had arrived in the mail. He soon departed telling her that he would be back later, that he had to return the car to the VIP Club in Knoxville. On cross examination she said that her son told her Jack Donaldson loaned him the car; that he had gone to Knoxville with Eddie Ames, Ronnie Henley and ten (10) other people. She was unable to explain why she left the definite impression in her direct testimony that he had told her he had borrowed the car from Eddie Ames.

Defendant testified that Ronnie Henley and Eddie Ames were just "riding by" a street intersection in Chattanooga when Ronnie hailed him and asked him to go to Knoxville. He did not know the purpose of the trip until he got there. They had a band, and after they got to the VIP Club he helped them set up. According to the defendant, they made the trip to Knoxville in a 1960 or 1963 black Cadillac limousine that Eddie Ames drove. Defendant said that he slept off and on all the way to Knoxville.

On direct examination he described the circumstances under which he obtained the Oldsmobile as follows:

"Q. What was said to you at the VIP Club that made you feel you had to come home?
A. Well, I didn't have no money to buy no food or anything, and I was told I would have to have some money—
Q. You're going to have to speak up. I think some of the—
A. (Interposing) I had to have some money so I could get me something to eat.
Q. How did you go about getting your money?
A. Well, I was outside the club and Jack Donaldson, you know, came up and said that he was informed that he was—
Q. (Interposing) Speak a little bit clearer.
A. He was informed—
MR. BEVIL: (Interposing) Object to what somebody else said.
Q. Did you—where did you get the car?
A. Outside the club.
Q. Did anybody—how did you get the keys to the car?
A. They was gave to me.
Q. Do you remember by whom?
A. Jack Donaldson.
Q. Who was Donaldson? Where was he?
A. Outside the club.
Q. Have you known him before?
A. His face, but I didn't know his name.
Q. How did you meet him?
A. Well, we was outside the club and we saw each other, and I introduced myself and then he introduced himself, and we saw—well, we had seen each other before.
Q. Did you ask him for a car to go home?
A. No, sir.
Q. Did he voluntarily give the keys to you?
A. Yes, sir."

On cross-examination, these further details were furnished:
"Q. If you really wanted to, you could do without eating?
A. Yes, sir.
Q. But instead, you decided to drive to Chattanooga to get some money; is that right?
A. No, sir, I didn't decide. It was—I went outside the club and this dude named Jack Donaldson came up and said he saw the position that I was in and I could trust him and he was hoping he could trust me that I would bring the car back.
Q. Now, let me—you didn't know Jackson Donaldson before this night? This was the 6th, right?
A. Well, I have seen him off and on in different places, but I didn't know his name.
Q. Is he from Chattanooga?
A. I wouldn't know.
Q. You don't know where he's from, but you've seen him different places?
A. Yes.
Q. Where's the last place you saw him, Mr. Turner?

A. The last place I saw him—Charleston, Virginia.

Q. And where was the place before that?

A. In Nashville.

Q. So you've seen him in Nashville and Charleston, Virginia, and you saw him this night in Knoxville, he just happened to be there, but you didn't know his name, you knew his face?

A. Yes.

Q. And this total stranger, in essence, said, 'Here's the keys to my car, go to Chattanooga,' and trusted you with his vehicle; is that what you're saying?

A. Yes, sir.

Q. You didn't mention it to him, I believe you said on direct testimony. You didn't mention it, he just volunteered the car?

A. Yes, sir.

Q. How did he know you wanted to come to Chattanooga, did you tell him that you were coming to Chattanooga?

A. Well, he asked me where I was from.

Q. And you told him Chattanooga?

A. Yes, sir.

Q. Did you say, 'I'd like to go back there and get some money?'

A. No, sir. He said, 'I hear you need some money,' and—"

Defendant testified that he left the VIP Club in the Oldsmobile about 10:30 p. m.

Ronnie Hensley testified that the group went to Knoxville in two cars; that he rode in defendant's car which he recalled was a "beige or white Datsun or something." He testified positively that defendant Turner drove that car all the way. He did not know whether defendant owned the car because he did not ask him. He testified that the last time he saw defendant at the VIP Club was just after the band had played the first set which they finished at 1:00 a. m. Saturday morning. He did not know defendant was going to drive a car back to Chattanooga. He did not know Jack Donaldson but he knew a man named Red that defendant said he was going outside to talk to about 1:00 a. m.

II.

The only assignment of error in this Court asserts that the trial judge erred, "[I]n charging the jury that mere possession without explanation raises the presumption of guilt, which presumption is sufficient for conviction."

The relevant portion of the charge as given follows:

"For a defendant to be found guilty of concealing stolen property, it is necessary for the State to prove, beyond a reasonable doubt, that the defendant concealed the stolen property in Hamilton County, Tennessee, knowing it to have been stolen, with the intent to deprive the true owner thereof.

The possession of fruits of the crime recently after its commission raises a prima facie presumption of guilt which may be rebutted by direct evidence, attending circumstances, good character, or otherwise. Possession of recently stolen property is circumstantial evidence from which the jury may draw an inference and the jury may convict on this evidence alone, but it is not bound to do so. It is for the jury to determine what weight is to be given such evidence. The inference is strong or weak according to the character of the property, the nature of the possession, and its proximity to the time of the theft."

Defendant argues that the charge states, in effect, a conclusive presumption on an essential element of the offense, guilty knowledge; that use of the phrase "the jury may convict on this evidence alone" is contrary to the objective test rule for the determination of guilty knowledge.

A scholarly amicus curiae brief has been filed on behalf of the Tennessee Association of Criminal Defense Lawyers. The principal objective of the brief is stated thus:

"The presumption in Tennessee should be reduced in strength to a permissible inference as it has been in most states and all federal jurisdictions and so charged to the jury in order to avoid the constitu-

tional problems which arise where a presumption such as the one at issue conflicts directly with the more fundamental presumption of innocence."

In *Bush and Bolton*, we have eliminated any vestige of conclusiveness in the application of the presumption or inference whether the fact sought to be inferred is guilty knowledge that the property was stolen or that the possessor was the thief. In that opinion, we believe that we have modified the use and application of the inference so that it will conform fully with the requirements of *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973), and prior United States Supreme Court cases discussed therein.

### III.

We disagree with the defendant's contention that the charge given required the jury to draw a conclusive presumption. Following the quoted portion of the charge, the trial judge instructed the jury fully and correctly on the law of circumstantial evidence, the presumption of innocence, the reasonable doubt standard, and made it clear that the burden of proof beyond a reasonable doubt remained upon the State throughout the trial. In our opinion the trial judge charged the inference in permissive terms—"may draw an inference" and "but it is not bound to do so." It is for the jury to determine what weight is to be given such evidence."

We have suggested that the charge given by the trial judge in *Barnes* be used as a model for instructions in cases involving the inference that may be drawn from proof of possession of recently stolen property. However, it is not per se prejudicial error to depart from the exact language of that instruction.

The jury did not believe defendant's explanation of how he obtained possession of the Oldsmobile. We are of the opinion that his explanation was contradictory to the accumulated common experience of mankind and completely bereft of credibility. The respects wherein the trial court's

instruction falls short of that given in *Barnes*, we find to be harmless error beyond a reasonable doubt in this case.

Affirmed.

COOPER, C. J., and HENRY, BROCK and HARBISON, JJ., concur.